CIRCUIT COURT.                                OCTOBER 26, 1861.
                        CRIMINAL LAW.

## THE UNITED STATES v. WILLIAM SMITH.

A merchant vessel belonging to citizens of the United States was captured by an armed vessel sailing under a commission of the Confederate States as a privateer. She was afterwards recaptured and brought with the defendant, who was one of the original captors and had been placed on board of her as prize master, in the first instance into Hampton Roads. After a detention there of several days, they were brought into the port of Philadelphia, where the defendant was committed for trial on the charge of piracy. On the trial the Court charged the jury:

1. That an established government may prosecute hostilities against its enemies in a civil war in like modes as against its foreign enemies in a national war; but that the results of a civil war do not alter its legal character and the enemies of the established government may, when captured, be liable to prosecution in its courts of justice as traitors or pirates.

2. Humane usages in the treatment of such persons, however commendable, are not, in a civil war, founded in any rules of absolute legal right; but are measures of governmental policy.

3. Privateering is recognized by the law of nations; but the commission of a revolutionary government whose existence is not recognized by that

of the United States, can confer no such authority as will change the legal character of piracy.

4. Where the revolutionary government has for a definite period been maintained in peace, it may be a question whether a resident under its dominion may not be exempted from criminal responsibility.

5. Compulsion to operate as a defence for the accused, must be actual force or such threats and intimidation, as placed him personally under a reasonable fear of death or bodily harm. The mere existence of an act of legislation of the revolutionary government under whose authority he resided, requiring military or naval service under pain of banishment or confiscation of property, is not such compulsion.

6. Under the act of 1820 a person first brought into one district, and afterwards apprehended in another, may be tried in the latter district.

INDICTMENT for piracy under act of Congress of May 15, 1820.

Tried before Judges GRIER and CADWALADER.

*J. Hubley Ashton,* Assistant District Attorney, *George H. Earle* and *Hon. William D. Kelley,* for the United States.

*John P. O'Neill, N. Harrison* and *George M. Wharton,* for the prisoner.

### STATEMENT.

This was the first case of this nature decided in any of the prize courts of the United States, that of the officers and crew of the schooner Savannah, who were on trial at the same time in the Circuit Court of the United States for the Southern District of New York, having resulted in the disagreement and discharge of the jury. The facts of the case admitted of no controversy and need no elaboration beyond the succinct statement contained in the judge's charge. The details are, however, abundantly interesting, and the whole case would appropriately find place in a collection of state trials.

It was argued with great force by counsel for the prisoner that the *animo furandi* was wholly wanting in the offence as proved, and that whether the prisoner were held amenable under the common law or the statute; that the status of a priva-

teersman sailing under letters of marque duly issued by an established revolutionary government could not be distinguished from that of the soldiers of the same government engaged in active service in the field; that both when captured became prisoners of war and were entitled to such treatment and no other as is accorded by the laws of war among civilized nations to prisoners so taken. Authorities of great weight were cited to show that no distinction in this respect existed in the case where the conflict partook of the nature and dimensions of a civil war, and that of a general national war, and the enlightened thought of modern times was invoked and appealed to in support of the argument. The case of the General Parkhill, so recently decided in this district (*ante,* page 479), was cited to sustain the doctrine that the present proportions of the contest were those of civil war as distinguished from mere insurrectionary rebellion and that all governments, including that whose authority was sought to be cast off, were at liberty to treat the revolted insurgents not as mere pirates or outlaws, but as entitled to the same immunities and subject to the same perils, as ordinary belligerents in a foreign war.

It will be seen that the Court while giving effect to this reasoning so far as it relates to usage, and pointing out that the legislative and executive departments of the government are the proper organs for its exercise, decides that the legal rule of the courts of the established government must remain unchanged, at least during the period of active hostilities and before the revolutionary government can lay claim to a peaceable establishment. No one can dispute the correctness of this decision in the present state of the law; but, a broad question remains open, whether the higher ethics of the rule as it exists in international law should not be incorporated into the municipal law. In this age an ultimate conflict in the execution of a sentence in every such case would almost unavoidably arise and the result, probably, would not be advantageous to authority. The present case may be instanced. Smith and the other defendants were

held as prisoners of war and afterwards returned to the Confederate government in an exchange of prisoners.*

CADWALADER, J., charged the jury.

Gentlemen of the Jury, independently of the request of the presiding Judge, this case, from its general importance and specific novelty, might require that the views of each member of the Court on the questions involved should be stated.

One of the witnesses examined on the part of the defence has deposed that in June last, the defendant shipped as one of the crew of an armed vessel called the Jeff. Davis, fitted out as a hostile cruiser against the United States. The defendant's counsel allege, and it is perhaps admitted by the counsel for the prosecution, that she was a privateer, commissioned under letters of marque and reprisal from the so-called Confederate States. The defendant appears to have resided at Savannah, Georgia, where he had followed the business of a branch pilot, and had been a person of good repute. He is entitled here to the benefit of this former good character, and also to that of the testimony which proves the kind treatment by the crew of the Jeff. Davis of their prisoners, while he was on board and afterwards. The same witness has testified that the defendant was a boatswain in this vessel, that he left Savannah for the purpose of joining her in the early part of June last; that he joined her at Charleston, South Carolina, where she then lay, and that he went to sea in her on the 28th of that month from Charleston.

The character and strength of her armament has been described by several witnesses; and some occurrences prior to those particularly charged in the indictment have been proved in order to show that she was cruising for the purpose of capturing merchant vessels of the United States. On

---

* See The United States *v.* Charles A. Greiner *ante,* p. 448, in which allusion is made to circumstances by the force of which acts otherwise treasonable may become those of a public enemy.

the 6th of July last, according to the testimony (of which you, of course, are the judges), she captured the schooner Enchantress, a vessel owned by citizens of the United States, laden with a cargo which was also the property of citizens of the United States. The facts proved, in order to show that the Enchantress and her cargo were forcibly taken and forcibly detained by her captors, are doubtless fresh in the recollection of the jury. The defendant, as prize master, with four others, was, according to the testimony, placed in charge of her. The place of capture, as one of the witnesses deposed, was about two hundred and fifty miles southeast of Nantucket South Shoal. The Enchantress, in charge of the prize crew, and according to the evidence under the command of the defendant, appears to have borne away to the southward, and after having been at sea till the 22d of July, to have been on that day recaptured off the coast of Carolina by a national armed vessel of the United States. This recapturing vessel was a steamer which took her in tow and brought her into Hampton Roads. The defendant and the others of the prize crew were kept as prisoners on board of this war steamer, which, after anchoring in Hampton Roads, near to Fortress Monroe, went a short distance up the Potomac, returned, and again anchored in Hampton Roads; after which she brought the prisoners, including the defendant, to Philadelphia, where they were taken into the marshal's custody.

This, I believe, is an outline of the whole of the proofs. I have taken full notes of the evidence with great care, and will read the whole, or any parts of it, to the jury, if any one of them, or any of the counsel, request me to do so.

The counsel for the prosecution contend that those who participated in the capture of the Enchantress and her cargo, were guilty of piracy under the act of Congress of 15th of May, 1820, which enacts that any person committing upon the high sea the crime of robbery in or upon any ship or vessel, or upon any of the ship's company of any ship or vessel, or the lading thereof, shall be adjudged a pirate. The

offence thus described in this act is, in the several counts of the indictment, stated in different specific or particular forms, in order to meet alternative aspects in which the case might be presented by the evidence. The indictment also contains an averment showing that the case is within the jurisdiction of the Court under the enactment that the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular State, shall be in the district where the offender is apprehended, or into which he may first be brought.

One of the points of law on which the counsel for the defendant have requested instructions to the jury, is, that this Court has no jurisdiction of the case, because, "after his apprehension on the high seas," he "was first brought into another district,"—meaning the Eastern District of Virginia, —"and ought to have been there tried." This instruction cannot be given. When he was taken prisoner, and was detained in the recapturing vessel, he was not apprehended for trial within the meaning of the act of Congress. His first apprehension for this purpose, of which there is any evidence, was at Philadelphia, after his arrival in this district. Whether he had been previously brought into another district, within the meaning of the act, is unimportant. It has been decided that, under this law, a person first brought into one district and afterwards apprehended in another, may be tried in the latter district. Therefore, if you believe the testimony on the subject, this Court has jurisdiction of the case.

Upon the main question of the guilt of the prisoner, there is, I believe, no dispute that the case would be within the words and meaning of the act of Congress, if the revolutionary proceedings whose character and effect have been discussed, had not occurred, and had not resulted in a civil war. An established government may prosecute hostilities against its enemies in a civil war in like modes as against its foreign enemies in a national war, and for certain purposes, with like effects. For example, vessels captured in the present civil war may be confiscable in prize courts of the United

States, and captured persons may be detained by the United
States as prisoners of war. Moreover, in all wars, national
as well as intestine, innocent and harmless inhabitants of
hostile districts, may, in common with authors and abettors
of the war, become involved in its calamities. These results
when produced by a civil war, do not alter its legal character.
They do not convert it into a foreign or a national war. In
a civil war—however organized and systematic the hostili-
ties prosecuted by an established government—its enemies,
may, when captured, be liable as traitors or as pirates, to
prosecution in its courts of justice. I have recently had oc-
casion to say, and I now wish to repeat, that during civil
wars, in which organized hostilities are prosecuted on an
extended scale, persons in arms against an established gov-
ernment, captured by its naval or military forces, are often
treated, not as traitors or pirates, but according to those
humane modern usages which are observed as to public ene-
mies in a national war. They are detained as prisoners of
war until exchanged or discharged on parole; or, if surren-
dered to the civil authorities for trial, are, after conviction,
respited or pardoned. Hostile feelings have thus been soft-
ened, and measures of retaliation, endangering a revival of
obsolete systems of barbarous warfare, have been prevented.
But some writers on public law have discussed the subject,
as if such civilized modern usages were founded in rules of
legal right, rather than in considerations of mere policy. I
therefore think it my duty to state that such usages, however
commendable, are not, in a civil war, founded in any rules
of absolute legal right, but are measures of governmental
policy. The question of their observance depends upon the
decision of the legislative or executive departments of the
government, not upon the opinions of its judicial organs.
Thus, courts and juries have, with such questions no proper
concern, certainly none that should influence the finding of
a verdict. The jury who find a defendant guilty, may, in-
deed, recommend him to mercy. But such a recommenda-
tion, though always respectfully considered, is, in law, no

part of the verdict itself.   In finding the verdict, the rules of law should be applied with calmness and firmness, without admitting any qualification of them from extrinsic reasons. If there is any rational doubt of the defendant's legal guilt, the jury should acquit him; otherwise, he should be convicted.

In the arguments of the counsel on both sides, the general question of the lawfulness of privateering, as a method of naval warfare, has been debated.   In a national war between independent States, privateering is at present lawful except where it has been abolished by treaty.   In such a war a commissioned privateer is to be treated as a part of the belligerent naval forces of the government which has granted the commission.   This heretofore established rule of the law of nations, cannot, so far as the United States may be concerned, be changed otherwise than by act of Congress, or by treaty with foreign governments.   No law of Congress to this effect has been enacted; no such treaty is in force; and, therefore, neither the executive nor the judicial organs of our government can, at present, rightfully condemn the practice of privateering.

But these remarks apply only to privateering in legitimate war, in which the commissioning government is that of an independent State.   The commission of a revolutionary government, whose existence is not recognized by that of the United States, can confer no such authority as will change the legal character of piracy, by merely giving to it the name and form of privateering.

Of the propositions of law upon which the defendant's counsel have requested instructions to the jury, only one has been as yet particularly answered.   The others involve the question whether the hostile revolutionary government may not have been so organized and established, in fact, if not of right, as to exempt a resident under its actual dominion from criminal responsibility for acts of submission or allegiance to it, though they may have included a hostile breach of his duty of allegiance to the United States.   The

question in another form is, whether the duty of allegiance may not have been so suspended there, as to relieve him of it to the extent required for the purpose of exemption from the guilt imputed in this indictment.

The law might be as the counsel have stated it, if either of two additional statements could be made: First, if the Government of the United States had been superseded by a local government, which, though it had originated in a hostile revolution had, for a definite subsequent period, been established and maintained in peace; or, secondly, if the defendant, though such a government had not been thus peaceably established and maintained, had been impressed into the hostile service of the revolutionary government, and compulsorily detained in such service. As to the first of these two points, the difficulty in the way of the defence is, that the Government of the United States has not been subverted, and that its authority in the hostile districts, if suspended, or at present superseded is not superseded by that of a government which has at any time been peaceably established, much less by one which has been maintained in peace. The government of the States now confederated for purposes hostile to the constitutional Union, was not organized without a contemporaneous outbreak of civil war. This war has been continued without interruption. The contest has been on their part a war against an established government, to which they owe allegiance. So long as this government exists, and the contest is maintained, the peaceable establishment of the revolutionary government cannot be asserted.

As to the other point—I mean the question of compulsion—the defence has not been sufficiently made out in law. The mere fact, if it were proved, that by an act of legislation of the revolutionary government, under whose power the defendant resided, military or naval service was required of every such resident, under pain of banishment, or confiscation of property, would be no justification or excuse. Unless actual force was exercised against him personally, or threats and intimidation placed him personally under a reasonable

fear of death or serious bodily harm, the allegation of compulsion cannot be sustained. If he was, at first, impressed forcibly into the hostile service, the inference might be that his detention in it was afterwards compulsory, so long as he remained on board the armed vessel in which he was a subordinate. But any such favorable inference would, even in that case, be rebutted by the proof that, as prize master, he afterwards remained in the hostile service when he was no longer a subordinate. The consideration of this point is, however, not necessary, because there is no sufficient proof that he did not at first engage voluntarily in the hostile service.

The propositions of law stated by the defendant's counsel must, for these reasons, be answered negatively.

The jury retired, and after an absence of three-quarters of an hour returned and rendered a verdict of "guilty."

The record shows, that a motion for a new trial and in arrest of judgment was made, but never argued or pressed.

Afterwards, the defendant, with the others who were tried and convicted on the same charge, were brought into court by the United States Marshal in return to a writ of habeas corpus; whereupon the District Attorney moved that they be remanded respectively to the military custody from which they passed into their present custody.

And every one of the defendants stating severally in open court that he had no objection to being thus remanded to military custody, leave is given to the marshal so to remand them.